Filed 4/28/23 In re J.M. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | |
| | D081059 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY et al., | |
| | (Super. Ct. No. J520689) |
| Plaintiffs and Respondents, | |
| v. | |
| T.S., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael P. Pulos, Judge. Affirmed.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant T.S.

Gary S. Plavnick, for Respondents To.S. and Ta.S.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Evangelina Woo, Deputy County Counsel, for Plaintiff and Respondent, San Diego County Health and Human Services Agency.

# INTRODUCTION

Maternal aunt T.S. (Aunt T.), appeals an order denying her request for placement of minor J.M. with a permanent plan of adoption after the termination of the parents' reunification services and immediately before the court selected a permanent plan for the child. She contends the juvenile court abused its discretion in denying her request for placement and erred in determining that the relative placement preference under Welfare and Institutions Code[1] section 361.3 did not apply at the late stage of this case. The San Diego County Health and Human Services Agency (Agency) supports Aunt T.'s position. To.S. and Ta.S. (Caregivers) disagree. They contend the court correctly determined the relative placement preference did not apply and it was not in J.M.'s best interests under section 388 to change placement. They further contend that even if the relative placement preference did apply, the court properly determined that placement with Aunt T. was not appropriate after considering the factors set forth in section 361.3. We agree with the Caregivers that the court did not abuse its discretion in denying Aunt T.'s request for placement. We, therefore, affirm the order.

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

FACTUAL AND PROCEDURAL BACKGROUND[2]

A.    *Initiation of Dependency Proceedings*

J.M was born addicted to methamphetamine and opiates due to Mother's daily use of heroin and sporadic use of methamphetamine throughout her pregnancy. She used heroin within six hours of J.M.'s birth, and used methamphetamine within two days of his birth. J.M. required treatment in the Neonatal Intensive Care Unit (NICU) with low dose methadone and morphine for his withdrawal symptoms. He also needed feeding assistance through a nasal tube.

About a week after J.M.'s birth, a social worker spoke with Aunt T. who lived in another state. Aunt T. said she "would get involved if the Agency removes the baby." Aunt T. was aware of the Interstate Compact on Placement of Children (ICPC) process for investigating homes for out of state placement (Fam. Code, § 7900 et seq.). She was "willing to go through the process if needed." Aunt T. did not like Father and described him as a "constant liar." M.S. (Mother) told the social worker that she did not have a good relationship with Aunt T. and she did not want Aunt T. involved with her child.

A social worker contacted the Caregivers about placing J.M. with them after his discharge from the hospital. The Caregivers met J.M. when he was eight days old and visited him in the NICU several times a week. They fed and burped J.M. and changed his diapers and bedding. They held him and

_____

[2]    A more detailed factual summary of the issues requiring detention are set forth in our unpublished opinion affirming the court's jurisdictional finding and detention from J.R.'s (Father) care. (*In re J.M.* (Nov. 5, 2021, D079061) [nonpub. opn.].) In this opinion, we focus on the facts related to J.M.'s placement during and after the reunification period.

3

rocked him to sleep. Caregiver Ta.S. attended J.M.'s physical and occupational therapy sessions.

Toward the end of March 2021, the Agency filed a petition on J.M.'s behalf under section 300, subdivision (b) alleging he suffered, or that there was a substantial risk he would suffer, serious physical harm or illness without the juvenile court's protection due to Mother's continued substance abuse and Father's inability to protect J.M. The juvenile court made a prima facie finding that J.M. was a person described by section 300, subdivision (b) and found that care in the parents' home was contrary to his welfare. The court ordered J.M.'s continued detention in the hospital until his release. Thereafter, the court ordered he be placed out of the parent's home at a temporary emergency shelter, in an approved foster home, or with a relative.

In early April 2021, Aunt T. told the social worker that family members on both sides of J.M.'s family wanted her to take J.M. because she was in the best position to care for him while the parents got the help they needed. Aunt T. thought the parents were minimizing concerns and enabling one another in their drug use. The social worker informed Aunt T. that Mother did not want her to participate in a scheduled family meeting and the Agency had to follow her wishes. Aunt T. asked for updates about the child. A couple of weeks later, Aunt T. told a social worker she would still like to be considered as a placement option. She was concerned about the child going to a foster home or to friends of the parents who would not set boundaries with the parents.

In another conversation, the social worker informed Aunt T. that she would start paperwork for an ICPC evaluation, but that even if her home were evaluated and approved, the court would not automatically place the child with her. The Agency needed to consider factors such as visitation and

4

reunification when evaluating an out-of-state placement. Aunt T. said she had a friend in the northern California area who was willing to open her home as a halfway point for visitation. Aunt T. also reported that the parents were communicating and exchanging money through a payment application.

Aunt T. called the social worker in early May 2021 to say she was upset that a friend of Mother's attended a child and family team meeting and Aunt T. was not permitted to do so. She thought the friend overstepped boundaries and that Mother was using the friend "to get back" at Aunt T. The social worker explained the Agency was working with Mother and needed to honor Mother's wishes if she did not want Aunt T. in the meeting. Aunt T. believed the parents were still in a relationship even though they said they were not together. She thought they would run away together with the child if Father got custody.

At the suggestion of the parents, the Agency spoke to several family friends who lived in another California county about potential placement of J.M. The friends understood Aunt T. wanted to be assessed for placement and they thought she should be a priority over them. The social worker said that the ICPC process is lengthy and that the Agency needed to consider visitation and reunification efforts. The friends were willing to take the child temporarily if their home were approved. The social worker did not believe their home could be approved before J.M. was released from the hospital or that the friends could be timely trained to administer the child's methadone treatments.

J.M. went to the confidential resource family home of the Caregivers at the end of May 2021when he was released from the hospital. The Caregivers received training and certification for approval to take J.M. home on a

5

controlled substance. They continued administering methadone treatment until J.M. was weaned from the treatment when he was between four and five months old.

In June 2021, a few days before the contested jurisdiction and disposition hearing, Mother sent the social worker a message saying she wanted J.M. to stay with Caregiver Ta.S. Mother opposed J.M. moving out of state even if an ICPC was approved for Aunt T. Mother requested a "do not move" order.

At the contested hearing, the court made a true finding on the petition and ordered J.M.'s continued detention with the Caregivers. It ordered the Agency to initiate an ICPC with Aunt T.'s state and to set a special hearing if it was approved. The court and counsel discussed whether the ICPC should be expedited or proceed in the regular course. After concluding an expedited ICPC was not necessary, the court commented, "We'll see where the parents are at . . . that time. And if visitation is going strong and parents are working aggressively on their case plan and the services, then, you know, maybe the move is not appropriate and reunification is around the corner for the parents. I mean, I hope that's the case for the parents and for this child as well." Both said they preferred J.M. to stay in the current foster home.

B.    *Six-Month Review Period*

Among J.M.'s medical issues, he suffered from "reflux, frequent spitting up, and constipation." The Caregivers provided a special formula to assist with digestion. As he grew older, he continued to have trouble with feeding and sleeping. He also had some sensitivity to texture and sound. A Developmental Screening and Enhancement Program evaluation in August 2021 noted areas of developmental concern including fine motor, gross motor, and personal social skills. Areas of social-emotional/behavioral concern

6

included the inability to self-sooth, eating and sleeping concerns, toileting/elimination concerns, as well as extreme and/or lack of emotions. He qualified for occupational and physical therapy and infant development services.

The Caregivers enrolled J.M. in a daycare group where medically fragile and typical children grow, play, and learn together. The program included skilled nursing care, activities, childcare and preschool, assistive technology, and a sensory integration room.

By December 2021, J.M.'s alertness and appearance improved. He smiled, cooed, and brought objects to his mouth. He interacted with the family cat by kicking his legs with excitement and shouting. The Caregivers expressed some concerns that he "zones out and stares off." She tried rubbing his feet, calling his name, and holding him to snap him out of it.

Mother continued to oppose placing J.M. with Aunt T. In September 2021, she told the agency that she did not want Aunt T. involved in J.M.'s life, much less considered for a permanent option. She described Aunt T. as harmful to "children, elderly, and a racist."

The Caregivers loved J.M. and said they would be happy to adopt him if necessary. They offered encouragement and involved the parents by sending pictures and updates. They also helped build a relationship with extended family members.

In December 2021, the Agency recommended termination of the parents' reunification services because the parents were not making progress in addressing the protective issues that brought the family into the dependency proceedings. Mother had not addressed her substance abuse issues and continued to struggle with substances. Father had minimal communication with the Agency and did not work on his case plan objectives.

The Agency submitted an ICPC packet in late January 2022 to assess Aunt T.'s out-of-state home. Aunt T. had not spoken to Mother for several months. She believed Mother was using drugs and experiencing homelessness.

J.M. still had difficulty with feeding and toileting issues. He remained underweight in comparison to his peers.

Aunt T. and her boyfriend visited J.M. in person for the first time in February 2022. She had two several-hour visits over two days and the Caregivers arranged for a third visit at a park before Aunt T. left town.

C. *Termination of Services*

The court held the contested six-month review hearing on February 15, 2022. The Agency and minor's counsel recommended termination of the parents' reunification services. The parents requested continuation of services. Father's counsel cited the pending ICPC approval process for Aunt T. as a factor in favor of continuing services since the Agency was still evaluating permanency options.

The court declined to continue services for six more months indicating it could not find such an extension appropriate when weighing the parents' progress against the child's best interests. The court terminated reunification services and stated J.M.'s current placement was "necessary and appropriate" even though the Agency was working on an ICPC for other options. The court set a permanency hearing for June 2022. The court deferred ruling on the Caregivers' de facto parent request.

D. *Permanency Planning Period*

Aunt T. and maternal grandmother visited J.M. for three nights in March 2022. The Caregivers provided all necessary items for J.M. to be comfortable and provided Aunt T. with a schedule for his eating and sleeping

8

routine. After the visit, J.M. appeared fussy and "wanted to be held all the time." He also started to exhibit separation anxiety.

Aunt T. came to San Diego for overnight visits with J.M. in April 2022. The Caregivers again provided items for J.M.'s comfort. Aunt T. described the visit as "perfect." She reported giving J.M. cough syrup directly from the bottle because she did not have a spoon. Aunt T. said J.M. slept for nearly 12 hours for three nights in a row, which the social worker said he had never done since he was born due to his ongoing medical needs. After the visit, Aunt T. sent the social worker an email describing the Caregivers as "very controlling" and "lying." She said she felt "betrayed" by the Caregivers and Ta.S.'s "stubbornness to continue to pursue adoption is scary to my family and I . . . we don't understand how a person could willingly want to keep a child from is bio family like that." Aunt T. said her ICPC was nearly complete and only a home walkthrough remained. The social worker informed Aunt T. that this was not accurate based on the ICPC updates provided to the social worker.

On April 22, 2022, Aunt T. told the social worker that Mother did not want the Caregivers to have her child. She said Mother felt stuck in California because of her son. Aunt T said, "We need [J.M.] to be with my family so my sister can come home and my parents can help her get clean so she can have a chance at knowing her son." The Agency expressed concern about the "true reasoning" behind Aunt T.'s request for placement of J.M.

That same day, Mother sent a social worker a message saying she wanted Aunt T. to take J.M. She said, "I don't want to stay down here when I'm out of my program because I have no reason to." When the social worker asked if Mother was aware that the Caregivers were willing to adopt J.M., Mother said she wanted J.M. to go to her sister out of state "because that's

where I'm going." She said he did not want her son to "live a life without knowing family and without knowing me."

The social worker informed Aunt T. in early May 2022 that the Agency was recommending J.M. remain in his placement with Caregivers with a permanent plan of adoption. Aunt T. did not ask questions privately about the recommendation. At a child and family team meeting held a few hours later, Aunt T. said she was worried about J.M. not being part of the biological family. She said Mother wants to have a relationship with J.M. and she would be able to do so if he was placed with family.

The social worker supervised a virtual visit between J.M., Aunt T., and Aunt T.'s boyfriend. The Caregivers and Aunt T. encouraged J.M. to engage in the call. The boyfriend made no effort to engage with J.M. and walked away from the screen about two minutes into the call.

E.    *Initial Section 366.26 Report and Addendum*

The Agency submitted its report for the permanency hearing in May 2022. It recommended termination of the parental rights and adoption by the Caregivers as the best permanent plan for J.M.

J.M., who was now over a year old, continued to have extensive medical needs. He had ongoing issues with his digestive system, slow weight gain, and skin issues. He continued to participate in occupational and physical therapy as well as infant development services. The Caregivers reported he made progress in reaching his milestones with these support services. He was also evaluated every six months by a High Risk Infant Clinic to monitor his development due to his drug exposure in utero.

J.M. was happy, smart, and playful. He was thriving in his current placement with the support of Caregivers. He enjoyed bonding with his foster sibling.

10

J.M. enjoyed attending a specialized daycare where he was exposed to educational activities and socialized with other children. After two overnight visits with Aunt T., J.M. had a difficult time separating from the Caregivers. The daycare staff reassured J.M. that the Caregivers would return for him. They expressed concern to the Caregivers and said they would support him with regulating his emotions.

Aunt T. had been involved in the case since the beginning and expressed a willingness to take placement for J.M. However, until recently, Mother objected to Aunt T's involvement and refused to allow Aunt T. to take placement or to be part of child and family team meetings. Aunt T. did not yet have ICPC approval because Aunt T. and her boyfriend still had pending items to complete.

The Agency's report analyzed the section 361.3 factors for preferential consideration of a relative's request for placement but concluded continued placement with the Caregivers was in J.M.'s best interests. They were the only caregivers he had ever known and they were consistently committed to meeting his many difficult medical and developmental needs since birth.

Mother only recently expressed a preference to place J.M. with Aunt T., apparently because Mother wanted to live near the family. Caregivers expressed concern that J.M. would experience emotional detriment by moving him from their home.

The Agency had concerns about the moral character of Aunt T., based on Mother's initial statements about her and based on Aunt T.'s reports about his eating and sleeping behavior during visits that were inconsistent with his history. Additionally, Aunt T.'s boyfriend, who resided in the home, had not shown a level of commitment to caring for J.M. Aunt T.'s first visit

with J.M. was when he was nearly a year old and she only had four in-person visits and a virtual visit with J.M. since birth.

In assessing the ability to provide a safe and secure environment for the child, the Agency noted that although Aunt T. expressed a desire to be protective of J.M., she also continuously mentioned he needed to with family to maintain contact with his biological mother. This concerned the Agency because Mother still had unaddressed issues with substance abuse.

Since the ICPC was still pending, the Agency did not have sufficient information about the background of Aunt T. and her boyfriend. It had concerns about the veracity of her visitation reports and her motivations to take J.M. to maintain contact with Mother.

In an addendum report submitted a few days before the scheduled permanency hearing, the Agency continued to recommend adoption by the Caregivers as the best permanent plan for J.M.

F. *Permanency Hearing and Pretrial Conference*

At the scheduled section 366.26 permanency hearing on June 13, 2022, the court set a contested hearing regarding placement and the termination of parental rights. Mother's counsel also requested a hearing regarding relative placement under section 361.3. The court deferred the request until the trial. The court granted the Caregivers' de facto parent request.

At this hearing, counsel for the Caregivers said Aunt T. received a copy of the Agency's section 366.26 report, which he said put the Caregivers "very far behind the Aunt, as far as knowing what is going on in this case." Apparently the court ordered Aunt T. to destroy the copy, but the Caregiver's counsel said, "You cannot undo what you did, as far as reading it." Counsel asked for an opportunity to review the report.

At a pretrial status conference on August 10, 2022, the Agency reported that Aunt T.'s ICPC was just approved and they were considering whether to change the recommendation regarding placement. The court set the matter for a several-day contested hearing. The court ordered that J.M. not be moved prior to the contested hearing.

The Caregivers' attorney again said Aunt T. had "inappropriately somehow received a copy" of the section 366.26 report and the Caregivers' petition to review confidential information was still pending. Counsel again requested an opportunity to review the Agency's initial permanency recommendations.

Both the Caregivers and Aunt T. filed section 388 petitions requesting placement of J.M. After making a prima facie finding on both petitions, the court set an evidentiary hearing along with the scheduled contested hearing.

G. *Addendum Report*

On August 29, 2022, days before the scheduled hearing, the Agency filed an addendum report changing its recommendation to now place J.M. with Aunt T. and her boyfriend. Father preferred J.M. to stay with the Caregivers.

J.M. continued to have deficits with gross motor, fine motor, problem solving, and personal social development. He participated in occupational therapy to address developmental delays. He still had gastroenterology issues and was referred to a nutritionist. He was on a waiting list for additional physical therapy sessions.

Aunt T. participated in regular video visits with her boyfriend often joining the call. She had several in-person visits in July. She and her boyfriend were scheduled for a three-day overnight visit.

Aunt T. told the social worker that it was in J.M.'s best interests to be with his biological family. She said if Mother was able to get clean, she could potentially have a relationship with J.M. She clarified, however, that she would not allow Mother to be around J.M. if she used drugs or alcohol.

Aunt T. felt she could meet J.M.'s needs based on her experience as a nanny. She had identified a pediatrician and understood the need for occupational therapy.

The Caregivers continued to provide for J.M.'s well-being and facilitated interactions with both maternal and paternal relatives. They thought it would be best for J.M. to stay with his foster family and continue care with his service providers.

The Agency included another analysis of the relative placement factors under section 361.3. It now concluded it was in J.M.'s best interests to place him in the relative home of Aunt T. to minimize the core issues of adoption. The Agency said Aunt T.'s involvement was limited in the first months of J.M.'s case because Mother initially refused to have Aunt T. involved and Mother told the Agency that Aunt T. was a "harm to children, elderly and a racist." A prior social worker had concerns about incongruent reports of behavior during J.M.'s initial visits with Aunt T. Now, however, Aunt T. had an approved ICPC home study from her home state, her boyfriend was attending most video visits, and they planned another in-person visit with J.M. together. Although J.M. preferred the Caregivers when transitioning to visits with Aunt T., the new social worker observed that he moved to Aunt T. with only brief discomfort. J.M. experienced some dysregulation after extended visits with Aunt T, but settled back into his home routine.

The Agency believed Aunt T. had demonstrated the ability to provide a safe, secure, and stable environment for J.M. through the ICPC evaluation as

well as supervised and unsupervised extended visits. Although there was concern about the deteriorating relationship between Aunt T. and the Caregivers, the Agency stated it had "resolved concerns" from the prior report regarding J.M.'s safety and stability in the care of Aunt T. and her boyfriend. In sum, the Agency believed the relative preference prevailed.

H.     *Contested Hearing*

The court conducted an extensive contested evidentiary hearing over five days.

Caregiver Ta.S. testified about meeting J.M. at the NICU when he was just days old. She described J.M.'s various medical issues from birth to the time of trial along with the care she, her husband, and the medical professionals provided for J.M. She described her efforts to arrange in-person visits and other contacts for J.M. and his paternal relatives. She stated she would continue to make sure J.M. knows his entire family, including maternal relatives, if he is placed with her.

Paternal grandmother testified in support of the Caregivers, explaining the efforts they made to maintain contact with the family. Additionally, the mother of J.M.'s half-sister testified for the Caregivers. The Caregivers kept in regular contact with her and invited them for visits to facilitate a relationship between the children. J.M.'s half-sister wanted to continue seeing him.

Social worker L.R., who was assigned the case from March 2022 to the end of June 2022, testified on behalf of the Caregivers. She prepared the first section 366.26 report and addendum, which recommended adoption by the Caregivers. She had no concerns about the excellent care provided by the Caregivers. She recommended placing J.M. with the Caregivers because it was the only home he had ever known. He recognized the Caregivers as his

15

parents and Caregiver Ta.S. was very open about maintaining contact with J.M.'s relatives. Mother's change of heart about placing J.M. with Aunt T. impacted the permanency assessment. L.R. was concerned that Aunt T. would allow Mother unfettered access to J.M.

The Caregivers also presented testimony from a social worker with expertise in attachment and trauma who opined that J.M. was developing a secure attachment to the Caregivers. If J.M.'s attachment to the Caregivers was disrupted, the expert opined that he would be traumatized and could have significant difficulties developing a secure attachment to subsequent parents and affect his social and emotional development, mental health, and future relationships. The expert also expected to see significant regression in J.M.'s development and behavior both in the short and long term.

A psychologist who testified on behalf of Mother said a child could develop a secure attachment with someone after a few visits and can have a secure attachment to multiple people. She did not have specific concerns about J.M. experiencing trauma from transitioning from one healthy experience to another.

A visitation monitor testified about his observations of two visits between Aunt T. and J.M. He had no concerns. He agreed that it was his job to collect evidence to support a case. Aunt T. said she wanted to try different foods for J.M. to increase his protein intake. The worker took this as a suggestion. The worker did not know if J.M. had special diet restrictions.

Social worker S.C., who was first assigned to the case in July 2022, testified for the Agency. She changed the Agency's recommendation for placement from the Caregivers to Aunt T. after reviewing the concerns expressed by the prior social worker. She observed a lengthy visit between

16

Aunt T. and J.M. in early July and a transition to a visit with Aunt T. in August. She also observed remote visits since her assignment to the case.

Social worker S.C. did not believe the incongruent information about early visits with Aunt T. was concerning because S.C. had a long interview with Aunt T. and the Agency obtained an approved ICPC after the Agency asked for these concerns to be explored.

S.C. agreed the Caregivers provided excellent care for J.M. and said he was a securely attached child "completely due to the devotion of the [C]aregivers." She believed he could form a secure attachment to his biological family and that it was in his best interests to be placed with them based on the core issues of adoption.

Social worker S.C. acknowledged that Mother did not want Aunt T. to be involved with J.M. for the first year of this case. She did not know why Mother changed her mind about placing J.M. with Aunt T. because Mother never responded to the social worker's contacts.

Aunt T. testified on her own behalf. She said she asked for placement of J.M. within days of when he was born and asked for an ICPC evaluation. She understood Mother did not want her involved and respected Mother's wishes during the reunification period.

Aunt T. reached out to a medical facility in her state where she believed providers could care for his needs. However, she acknowledged she did not have full information about J.M.'s medical needs. She understood he was a failure to thrive child, he was receiving occupational therapy, and he was on a waiting list for physical therapy. She said she learned information about J.M.'s needs from the Caregiver's testimony at trial.

She testified she tried different foods with J.M. during her visits with him based on information she obtained from two physicians for whom she

works as a nanny.  She acknowledged they are not J.M.'s doctors.  When asked how she would handle behavioral issues or trauma that might occur if J.M. were removed from the Caregivers' home, she did not have a plan, but said she would ask for help from a pediatrician or other providers.

Aunt T. had no contact with J.M.'s father, but she did have a relationship with J.M.'s paternal grandmother.  She did not plan to maintain contact between J.M. and his half-sibling.

On the last day of trial, Mother's counsel reported that Mother changed her position again "midway through trial, after careful consideration and listening to the evidence."  Mother now believed it was in J.M.'s best interests to stay with the Caregivers.

After considering the evidence and closing arguments by the parties, the court gave an oral summary of its ruling and issued a 30-page written order denying Aunt T.'s request for placement of J.M.  The court determined the relative placement preference did not apply at this stage of the proceedings and Aunt T. was required to establish a change in placement was in J.M.'s best interests under section 388.  The court denied Aunt T.'s section 388 petition because it found she failed to make the appropriate showing.  The court alternatively determined that placement with Aunt T. was not appropriate considering the relative placement preference factors in section 361.3.

DISCUSSION

A.     *Overview of Relevant Statutes*

We begin our discussion by describing the relevant statutes that guide our analysis.

1.     *Section 361.3*

Generally, "[w]hen a child is removed from parental custody, the Legislature prefers placement with the child's relatives, whenever possible." (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1049.)  After removal, section 361.3, subdivision (a) requires "preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative[.]"  The statute defines " 'preferential consideration' " to mean "the relative seeking placement shall be the first placement to be considered and investigated."  (§ 361.3, subd. (c)(1).)  "The intent of the Legislature is 'that relatives be assessed and *considered* favorably, subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child.' " (*In re Isabella G.* (2016) 246 Cal.App.4th 708, 719 (*Isabella G.*).)

To determine whether placement with the relative is appropriate, both the Agency and the court must consider the placement factors listed in section 361.3, subdivisions (a)(1) through (8).  These factors include the best interests of the child, the parent's wishes, placement of siblings in the same home, the "good moral character of the relative and any other adult living in the home" including criminal history, the nature and duration of the relationship between the child and the relative, and the ability of the relative to provide for the child's needs safely and securely and to facilitate reunification efforts with the parents and visitation with other relatives. (§ 361.3, subd. (a)(1)–(8); *Isabella G., supra,* 246 Cal.App.4th at p. 719, fn. 9.)

19

The preferential consideration under section 361.3 "does not create an evidentiary presumption in favor of a relative, but merely places the relative at the head of the line when the court is determining which placement in the child's best interests." (*In re Sarah S.* (1996) 43 Cal.App.4th 274, 286 (*Sarah S.*).) The Agency's assessment of the relative is "subject to the juvenile court's consideration of the suitability of the relative's home and the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 320; *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1033 [juvenile court exercises its independent judgment concerning the relative's request for placement].)

The plain language of section 361.3 "provides for preferential consideration of a relative's request for placement of a child with the relative early in dependency proceedings, before the disposition order." (*In re J.Y.* (2022) 76 Cal.App.5th 473, 477.) It specifies that the relative placement preference also applies "after disposition, if the child's placement must change." (*Id.* at p. 478, citing § 361.3, subd. (d).) Courts, including this court, have held the "relative placement preference under section 361.3 applies throughout the reunification period." (*In re Maria Q.* (2018) 28 Cal.App.5th 577, 595 (*Maria Q.*).)

Section 361.3 may apply after the reunification period "where the relative has made a timely request for placement during the reunification period and the child welfare agency has not met its statutory obligations to consider and investigate the relative seeking placement." (*Maria Q.*, *supra*, 28 Cal.App.4th at p. 595, citing *In re Isabella G.* (2016) 246 Cal.App.4th 708, 723 (*Isabella G.*).)

In *Isabella G.*, we held "that when a relative requests placement of the child prior to the dispositional hearing, and the Agency does not timely complete a relative home assessment as required by law, the relative

20

requesting placement is entitled to a hearing under section 361.3." (*Isabella G.*, *supra*, 246 Cal.App.4th at p. 712.)  In that case, the grandparents requested placement before the detention, jurisdictional, and dispositional hearings.  (*Id.* at p. 722.)  The agency did not conduct a home assessment of the grandparents and erroneously told them the child's placement could not be changed for a year.  (*Id.* at pp. 722–723.)  Relying on this misrepresentation,  the grandparents waited a year before requesting placement again, shortly before the 12-month review hearing.  (*Ibid.*)  When the Agency still did not assess the grandparents' home for placement, the grandparents again requested placement after the court terminated reunification and set a section 366.26 hearing.  After the grandparents retained counsel and filed a section 388 petition, the Agency finally conducted a home assessment and approved the placement in less than three weeks.  (*Id.* at p. 723.)  Under the facts of that case, we concluded the court prejudicially erred in not evaluating the grandparents' timely request under section 361.3.  (*Id.* at pp. 723–725.)

Once the case reaches the stage to select a permanent plan under section 366.26, however, the directive in section 361.3, subdivision (a) to give "preferential consideration" to a relative does not apply to override the statutory permanency preferences in section 366.26.  (*Maria Q.*, *supra*, 28 Cal.App.5th at p. 596.)  Still, in assessing a relative's request for a plan of legal guardianship or a permanent placement plan "(other than adoption, which has its own criteria) . . . the juvenile court must consider the relative placement factors listed in section 361.3."  (*Id.* at pp. 596–597; see § 366.22, subd. (c)(1)(D).)

21

2.    *Section 388*

Section 388 provides, in pertinent part:  "Any . . . person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court.  The petition shall be verified and, if made by a person other than the child . . . shall state the petitioner's relationship to or interest in the child or the nonminor dependent, and shall set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order or termination of jurisdiction."  (§ 388, subd. (a)(1).)

Courts have described section 388 as an " 'escape mechanism' " for parties and interested individuals to seek modification of a juvenile court order before termination of parental rights.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 (*Marilyn H.*).)  "Such a motion may be brought pursuant to section 388 at any time after the minor has been declared a dependent child of the juvenile court."  (*Stephanie M., supra*, 7 Cal.4th at p. 317.)  A party bringing a petition pursuant to section 388 "has the burden of showing, by a preponderance of the evidence, that (1) there is a change of circumstances or new evidence, and (2) the proposed change is in the child's best interests." (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 257.)

B.    *Standard of Review*

We review the juvenile court's placement orders under section 361.3 for abuse of discretion.  The court is given wide discretion and its determination will not be disturbed absent a manifest showing of abuse.  (*Sarah S., supra*, 43 Cal.App.4th at p. 286; see *Stephanie M., supra*, 7 Cal.4th at p. 318 ["when

22

a court has made a custody determination in a dependency proceeding, ' "a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' "].) "The reviewing court should interfere only ' "if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did." [Citations.]' " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

Similarly, we review the grant or denial of a section 388 petition for abuse of discretion. (*In re Shirley K.* (2006) 140 Cal.App4th 65, 71.)

C.    *Application*

1.    *The Court Did Not Abuse Its Discretion in Declining to Apply the Relative Placement Preference After Termination of Reunification Services*

In this case, the court considered Aunt T.'s request for placement after termination of the parents' reunification services and "moments away from a contested section 366.26 hearing" where the Agency recommended termination of the parental rights and a permanent plan of adoption for J.M.

The court interpreted *Isabella G.* and subsequent cases to mean that the relative preference of section 361.3 may apply after reunification services have ended only where "the failure to assess . . . was really a failure to consider, investigate, or assess the relative *at all*." In other words, if the agency "ignored" or "disregarded" a timely request from a relative for placement during the reunification period, the court may make an exception and apply the relative placement preference after termination of reunification services. (*Maria Q.*, *supra*, 28 Cal.App.5th at p. 593; *Isabella G.*, *supra*, 246 Cal.App.4th at p. 723.) As the juvenile court said, this interpretation leaves room for the possibility that an Agency can fall short of its duties to complete aspects of a section 361.3 evaluation without entirely ignoring a relative

23

placement request. In such situations, the *Isabella G.* exception would not apply. We agree with this interpretation.

The court here determined the *Isabella G.* exception did not apply based on the facts of this case. Aunt T. told the Agency at the beginning of the case she was willing to undergo the ICPC process for approval, if necessary. Months later, well after the disposition hearing and after J.M. was placed with the foster parents, Aunt T. said she would like to be considered for adoption, should that be needed. Aunt T. said she "knew reunification was first and most important" but they wanted to be prepared and asked for an ICPC to be prepared. At trial, Aunt T. clarified that she did not initially ask for placement of J.M. because she respected her sister and "it was within the reunification" and she "wanted [Mother] to do well and do better so she could have her son back." She said she started pushing for placement roughly six months later.

Although the Agency did not formally evaluate Aunt T. for placement during the reunification period, they were in regular contact with her. Based on the court's review of the entire record of the case, the court concluded the Agency implicitly determined Aunt T. was not a suitable placement for J.M.

The court's order looked at the events leading up to the jurisdiction and disposition hearing "through the lens of the factors outlined in section 361.3." First, given J.M.'s medically fragile state and his significant health needs in the first months of his life, including the need for extended care in the NICU, it was not in his best interests to place him with Aunt T. in another state. (§ 361.3, subd. (a)(1).)

Second, the parents' wishes weighed against placement with Aunt T. (§ 361.3, subd. (a)(2).) Mother said she was not close with Aunt T., described their relationship as "rocky," and adamantly opposed Aunt T.'s involvement

24

with J.M.  The court observed that the day before the contested jurisdiction and disposition hearing, Aunt T. told the social worker she wanted a "stalking order" to protect herself against Mother and would want someone present to monitor visits with Mother for safety reasons.  Aunt T. also said she did not like Father from the start and called him a "constant liar." Father said he had only met her once for a few hours and did not know how she could have come to this conclusion.

The third factor, which requires consideration of the proximity of the natural parents to placement "to facilitate visitation and family reunification" (§ 361.3, subd. (a)(3); Fam. Code, § 7950, subd. (a)), "cut heavily against placement" with Aunt T. because the parents lived in San Diego and Aunt T. lived in another state, which would make visitation and reunification difficult.

Additionally, the seventh factor evaluates the ability of the relative to not only provide a safe, secure, and stable environment for the child with the necessities of life, but also to facilitate reunification efforts with the parents, including visitation.  (§ 361.3, subd. (a)(7).)  The social worker explained to Aunt T. early in the case that even if an ICPC were approved, the child would not automatically be placed with her because the Agency had to consider factors such as visitation and reunification when there was an out of state placement.

The juvenile court concluded that even though some factors weighed in favor of placement with Aunt T. at the time of disposition, "the overwhelming balance weighed against the placement."

Contrary to the contentions of Aunt T. and the Agency, the court did not improperly evaluate the section 361.3 factors at the time of disposition rather than when she filed her section 388 petition.  The court engaged in

25

this exercise to show the Agency did not *ignore* Aunt T.'s requests, but at least implicitly examined the relative preference factors early in the case and determined it was not appropriate to place J.M. out of state with Aunt T.

Although the court was not pleased that the Agency waited for months to begin the ICPC process after the court ordered it, the court said, "everyone understood" at the disposition hearing "and, indeed quite likely throughout any plausible reunification period" that placement with Aunt T. in another state "was simply not appropriate under the factors in section 361.3 given the circumstances of this particular family and the needs of [J.M.]." Therefore, the court concluded that the *Isabella G.* exception did not apply to require consideration of the relative placement preference after termination of reunification services. Based on our own review of the record, we conclude the juvenile court did not abuse its discretion in making this determination.

2. *The Court Did Not Abuse Its Discretion in Denying Aunt T.'s Request to Modify Placement Under Section 388*

The court then considered Aunt T.'s request for placement within the context of section 388, which predominantly requires the court to "determine the child's best interests." (*Stephanie M., supra*, 7 Cal.4th at p. 320.)

The court carefully considered Aunt T.'s request for placement. It again used the section 361.3 factors as guideposts for its analysis. This time, it considered the factors using information from throughout the case, including information developed at trial. The court ultimately determined that Aunt T. did not show a change in placement was in J.M.'s best interests.

The court considered J.M.'s secure attachment to the Caregivers, who provided the only home he has known in his young life. The Caregivers have provided for his every need since he was in the NICU, including managing his withdrawal treatment and addressing his ongoing medical and developmental needs. The court found that severing this relationship would

"undoubtedly cause him detriment and trauma, not just from the loss of these strong attachments, but from the immediate risk of significant regression" in his medical and developmental issues.

Considering J.M.'s psychological, medical, or emotional needs, the court acknowledged that Aunt T. would provide a biological connection and that Aunt T. made efforts to visit J.M. and to develop a relationship. However, the court stated "other immediate considerations outweigh the potential future benefit of placement with Aunt T."

The court was concerned that placing J.M. with Aunt T. would detrimentally delay care for J.M.'s medical needs. Aunt T. was not fully aware of his needs even though she had been included in recent child and family team meetings and had the opportunity to ask about J.M.'s needs over the prior eight months. The court found it concerning that Aunt T. said she learned information about J.M.'s medical and nutritional needs from the Caregiver's trial testimony even though the social worker reported previously speaking at length to Aunt T. about his medical issues and requirements for health care providers.

The court was also concerned that Aunt T. was not equipped to handle J.M.'s special needs. The court found several issues with Aunt T.'s credibility during the trial and questioned whether she would accurately report to the Agency or the court about J.M's well-being. The court was concerned this lack of candor could jeopardize his safety.

The court examined factors related to the wishes of the parents (§ 361.3, subd. (a)(2)), the ability to facilitate visitation with the parents and other relatives (§ 361.3, subd. (a)(3) and (7)(F), to provide a secure and stable environment for the child (§ 361.3, subd. (a)(7)(A)), and to protect the child from the parents (§ 361.3, subd. (a)(7)(D)).

27

Most of the maternal family (who all lived out of state) supported placement with Aunt T., whereas the paternal family opposed the placement. The court noted Mother was initially "vehemently opposed" to placement with Aunt T. She eventually agreed to placement just before the contested hearing, but on the final day of trial said she no longer supported placement with Aunt T. and preferred that J.M. remain with the Caregivers. Although the court weighed certain factors in favor of Aunt T., it expressed serious concern about the volatility of the family dynamic and the possibility that J.M. would remain in contact with Mother who still had unaddressed substance abuse issues.

The court also commented about the sudden change of the Agency's position less than two weeks before the contested permanency hearing. The court observed the only thing that changed was the ICPC approval and the social worker assigned to the case. The court did not believe it could infer that the ICPC reviewers fully considered and resolved the array of concerns outlined in the first section 366.26 report and rejected the notion that it should "blindly" delegate the court's duty to independently review the evidence.[3]

Considering all these factors, the court determined it was not in J.M.'s best interests to change placement.

We again find no abuse of discretion. "[T]he court was fully aware of the difficulty of the choice and, with the parties before it, was best able to make the hard call of which placement, under the circumstances as they then

_____

[3] Although not specifically mentioned by the court in its order, we note that the social worker thought the Agency's earlier concerns were resolved after having a lengthy discussion with Aunt T. on July 18, 2022. Interestingly, this conversation was after Aunt T. somehow obtained a copy of the earlier section 366.26 report.

existed, was in the minor's best interest. . . . Faced with the successful bonding of the minor with the de facto parents, and the uncertainty of how the minor would respond to removal from the parental figures he had known since birth, we cannot say that the court abused its discretion in concluding that his continued placement was in his best interest." (*In re M.H.* (2018) 21 Cal.App.5th 1296, 1305–1306.) At this stage of the proceeding, "the overriding focus of dependency proceedings was not on Aunt's interest in caring for the [child] but on the [child's] interests in securing the most stable, safe and secure permanency plans possible under the circumstances." (*Maria Q., supra*, 28 Cal.App.5th at p. 597.)

3. *The Court Did Not Abuse Its Discretion In Alternatively Considering The Relative Placement Preference*

Finally, the court alternatively considered the relative placement preference under section 361.3 in case it was incorrect in its interpretation of the *Isabella G.* exception. It still declined to place J.M. with Aunt T. The court expressly found that even if Aunt T.'s request was given preferential consideration, and removing all consideration of J.M.'s current attachment to his current caregivers, the court would still decline to place J.M. in Aunt T.'s care for all the reasons outlined in its analysis of the section 388 petition.

Even when considering a request for a dependent child's placement with a relative under section 361.3, the juvenile court is required, first and foremost, to consider the best interests of the child, including special physical, psychological, educational, medical, or emotional needs. (§ 361.3, subd. (a)(1).) The court must also consider whether the relative would exercise proper, effective care, and control of the child. (§ 361.3, subd. (a)(7) (B).) Given the numerous concerns the juvenile court identified in its order, we cannot conclude the court abused its discretion in denying Aunt T.'s placement under any standard.

29

## DISPOSITION

The order is affirmed.

McCONNELL, P. J.

WE CONCUR:


IRION, J.


BUCHANAN, J.